IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **KENNETH MARSTON GOOD, et. al.,** | § | |
| | § | |
| Appellant, | § | |
| | § | |
| v. | § | No. 4:09-cv-319 |
| | § | |
| **RMR INVESTMENTS, INC.,** | § | |
| | § | |
| Appellee. | § | |

**MEMORANDUM OPINION & ORDER RESOLVING APPEAL
FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS SHERMAN DIVISION**

Legacy Capital Investments, LLC ("LCI") appeals the bankruptcy court's May 21, 2009, "Memorandum Opinion and Order" denying LCI's "Motion for Reconsideration of Order Granting in Part Motion for Reconsideration of Confirmation Order." (*See* Record 21.) In that order, the bankruptcy court upheld its conclusion that RMR Investments, Inc. ("RMR") had established grounds for relief from the Confirmation Order under Rule 59(e). Having reviewed the parties' briefs, the record, and the relevant legal principles, the court finds the bankruptcy court's decision should be **AFFIRMED**.

**I. BACKGROUND**

On June 3, 2008, LCI filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code. LCI is an entity operated by Kenneth Good ("Good"). Between April 15, 2008 and June 30, 2008, Good and several entities operated or controlled by

1

Good (collectively, "the Debtors") filed voluntary petitions for bankruptcy.[1]  The Debtors' cases were jointly administered by the bankruptcy court.

On October 24, 2008, the Debtors submitted their "First Amended Joint Plan of Reorganization," in which the Debtors proposed to pay all of their creditors in full over four years by developing and selling various real estate assets.  At the conclusion of the four years, the Debtors anticipated that they would have an equity balance of approximately $85,000,000.  To resolve the objections of numerous creditors, including RMR, the Debtors filed their First, Second, Third, and Fourth Modifications to the plan (collectively, the "Modifications").  The Modifications resolved the objections of every creditor except RMR.

RMR holds an allowed secured claim against LCI and an unsecured guaranty claim against Good.  In June 2007, RMR and LCI entered into a promissory note, whereby RMR loaned LCI $7,860,000.  The terms of the Note required LCI to make monthly interest payments to RMR beginning August 1, 2007 and continuing until the maturity date.  The initial maturity date under the note was the earlier of one year after the date of the note or upon an event of default.  The applicable rate of interest under the note was the higher of the prime rate plus 2.75% or 11% per annum.  In the event of default, the applicable rate of interest would increase by 4%, not to exceed the maximum lawful rate.

As a part of this transaction, LCI executed a Deed of Trust in favor of RMR.  The Deed of Trust granted RMR a first priority security interest in 86.557 acres of unimproved land in

---

[1]The specific entities that filed for Chapter 11 relief were: KG Legacy Ozarks, LLC ("KG Legacy Ozarks"), Legacy Capital Investments, LLC ("LCI"), KG Legacy Premier, LLC ("KG Legacy Premier"), LMI LBL, LCC ("LMI"), LMI 1 New, L.P. ("LMI 1 New"), KG Legacy Josey, LLC ("KG Legacy Josey"), and LMI 1 New Parkway, L.P. ("LMI 1 New Parkway").

Flower Mound, Texas and all mineral rights and contracts that LCI had or could acquire relating to the property.  In addition, Good executed a guaranty agreement whereby he guaranteed the obligation of LCI to repay the amounts due and owing to RMR.  LCI was in default when Good filed his voluntary petition on April 15, 2008.

On August 13, 2008, the Debtors filed their joint plan of reorganization, which proposed that the postconfirmation interest rate be set according to the prime rate.  On February 19, 2009, the bankruptcy court entered an "Order Confirming Debtors' First Amended Joint Plan of Reorganization, as Modified." (Record 13.)  In that order, the court confirmed the Debtors' Plan over the objection of RMR, holding that the proper "cramdown" rate of interest payable under the Plan to RMR was the prime rate of interest plus 2%, and that the proper length of deferred payments to RMR under the Plan was four years from the date of confirmation. (*Id.* at 11.)  According to the court, RMR's contention that the Plan rate did not reflect actual market risks was weakened by the fact that "the five other lenders which are, like RMR, secured by Dallas-area real estate have agreed to interest rates ranging from 5 – 6% per annum." (*Id.*)

On March 1, 2009, RMR filed its "Motion to Alter or Amend Judgment and Motion for Reconsideration," in which it argued that because LCI was solvent, the proper rate of interest was the default interest rate in the Note, not the 5.25% proposed in the plan. (Record 14.)  Additionally, RMR argued the proper term of deferred payments under these circumstances was no more than three years. (*Id.*)  After a hearing, the bankruptcy court granted RMR's motion and held that the proper rate of cramdown interest was the contractual default rate of 15% and that the proper term of deferred payments was no more than three years. (Record 17.)

The Debtors then filed their own motion to alter or amend the Reconsideration Order,

3

arguing that LCI was no longer solvent, there had been no manifest error of law in the Confirmation Order, and that RMR's arguments were not the proper subject of a Rule 59(e) motion to alter or amend. (Record 19.) The bankruptcy court denied the Debtors motion to alter or amend and this appeal followed. (*See* Record 21.)

LCI raises two issues on appeal. First, LCI argues that the bankruptcy court erred when it concluded that the proper rate of "cramdown" interest payable by LCI to RMR is the pre-petition default interest rate. Second, LCI argues that the bankruptcy court erred when it determined the proper term of deferred payments payable to LCI is three years from confirmation, rather than the four years proposed under the Plan.[2]

---

[2] The court notes that in their "Statement of Issues Presented on Appeal and Designation of Items to be Included in Record on Appeal" (Dkt. 2) Debtors designated three issues for resolution on appeal:

1. Whether the Bankruptcy Court erred in finding that Legacy Capital Investments, LLC ("LCI") is a solvent entity for purposes of determining the proper "cramdown" rate of interest under 11 U.S.C. § 1129(b)(2).

2. Whether the Bankruptcy Court erred in concluding that the proper rate of "cramdown" interest payable by LCI to RMI Investments, Inc. under 11 U.S.C. § 1129(b)(2) and the Debtors' First Amended Plan of Reorganization, as Modified (the "Plan"), is the pre-petition default rate of interest, *i.e.*, 15% per annum.

3. Whether the Bankruptcy Court erred in concluding that the proper term of deferred payments payable by LCI to RMR Investments, Inc. under 11 U.S.C. § 1129(b)(2) and the Plan, is three (3) years from confirmation rather than the four (4) years offered under the Plan.

However, because Appellants only addressed issues two and three in their brief, this court's review is limited to the issues discussed in the substance of Appellant's brief. *See Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 374–75 (5th Cir. 2005) ("An assertion that a ruling is being appealed, in the absence of any argument in the body of the brief supporting the appeal, does not preserve the issue on appeal.").

## II. STANDARD OF REVIEW

This court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of a bankruptcy court. 28 U.S.C. § 158(a)(1) (2006). "A bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo." *Entringer Bakeries, Inc. v. First Bank & Trust (In re Entringer Bakeries, Inc.)*, 548 F.3d 344, 348 (5th Cir. 2008).[3]

## III. ANALYSIS

### A. Calculation of Postconfirmation Interest

A bankruptcy court's calculation of an appropriate "cramdown" interest rate for purposes of Chapter 11 plan modification is a question of fact reviewed for clear error. *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 800 (5th Cir. 1997). Under a clearly erroneous standard of review, the district court, sitting as an appellate court, must affirm the decision of the bankruptcy court if the bankruptcy court's account of the evidence is "plausible in light of the record viewed as a whole." *See Jarvis Christian College v. Nat'l Union Fire Ins. Co.*, 197 F.3d 742, 746 (5th Cir. 1999). "In practice, the 'clearly erroneous' standard requires the appellate court to uphold any [lower] court determination that falls within a broad range of permissible conclusions." *Id.* (*quoting Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400 (1990)). Therefore, a finding is not clearly erroneous

---

[3]In the present case, LCI appeals the bankruptcy court's denial of its motion to reconsider. Although typically a denial of a motion to reconsider is reviewed for abuse of discretion, because LCI's brief suggests it intended to appeal the merits of the court's calculation of postconfirmation interest and term of deferred payments, this court will review the merits of that decision according to the appropriate standard of review. *See Fletcher v. Apfel*, 210 F.3d 510, 512 (5th Cir. 2000) (holding de novo review appropriate for appeal of denial of motion to reconsider order granting summary judgment where appeal of Rule 59(e) motion was solely a motion to reconsider the judgment on its merits).

unless the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Id.* at 745 n.4 (quotations omitted). Applying this standard in the present case, the bankruptcy court's determination of the postconfirmation interest rate should be upheld unless it strikes this court as dead wrong or completely outside the range of permissible conclusions. As set out more fully below, nothing in the record before the court indicates that such an egregious error has been made.

A judicial "cramdown" is the "modification of the rights of a secured creditor over its objection." *Wells Fargo Bank NW, N.A. v. Yett (In re Yett)*, 306 B.R. 287, 291 (B.A.P. 9th Cir. 2004). The cramdown provisions set forth in 11 U.S.C. § 1129(b) allow courts to confirm a reorganization plan over the objections of the creditor "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1) (2005). The Bankruptcy Code is silent, however, as to how bankruptcy courts should calculate the appropriate cramdown interest rate. *Bank of Montreal v. Official Comm. of Unsecured Creditors (In re American Homepatient, Inc.)*, 420 F.3d 559, 565 (6th Cir. 2005).

In the absence of a clear statutory directive, "[c]ourts have used a wide variety of different rates as benchmarks in computing the appropriate interest rate (or discount rate as it is frequently termed) for the specific risk level in their cases." *Heartland Fed. Savings & Loan Assoc. v. Briscoe Enters., LTD., II (In re Briscoe Enters., LTD., II)*, 994 F.2d 1160, 1169 (5th Cir. 1993). Among these methods are the formula rate, the coerced loan rate, the presumptive contract rate, and the cost of funds rate. *Till v. SCS Credit Corp.*, 541 U.S. 465, 473 (2004) (discussing methods of calculating cramdown interest in Chapter 13 cases). Although some

courts require the application of a specific method for calculating cramdown interest, in the Chapter 11 context, the Fifth Circuit has repeatedly declined to do so. *See T-H New Orleans*, 116 F.3d at 800; *Briscoe*, 994 F.2d at 1169. As the court explained in *T-H New Orleans*, a bankruptcy court's calculation of the postconfirmation interest rate involves a fact specific determination of the risk level in a particular case. *T-H New Orleans*, 116 F.3d at 800. Because risk analysis involves the weighing of witness' testimony, demeanor and credibility, the Fifth Circuit has declined to "tie the hands of lower courts as they make the factual determination involved in establishing an appropriate interest rate." *Id.* Therefore, absent clear error, the bankruptcy court's determination will not be disturbed. *Id.*

In the present case, relying on the Sixth Circuit's decision in *Official Committee of Unsecured Creditors. v. Dow Corning Corporation (In re Dow Corning Corp.)*, the bankruptcy court adopted the presumptive contract approach to determine the cramdown interest for RMR's claim. Under that approach, "[w]hen a debtor is solvent, [ ] the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties, and the role that equitable principles play in the allocation of competing interest is significantly reduced." *In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006). In the Fifth Circuit, courts considering cramdown interest in cases involving insolvent debtors have reached similar results. *See, e.g.*, *T-H New Orleans*, 116 F.3d at 800; *Brisco*e, 994 F.2d at 1169 (noting "[n]umerous courts have chosen the contract rate if it seemed to be a good estimate as to the appropriate discount rate"); *In re Sylvan I-30 Enters.*, No. 05-86708, 2006 WL 2539718, at *7 (Bankr. N.D. Tex. Sept. 1, 2006) (unpublished) (applying contract rate because "[t]he interest rate required of the Debtor prepetition is a fair measure of the market's assessment of the risk associated with dealing with

the Debtor").

Although RMR argued on reconsideration that the contractual rate of interest must be applied "as a matter of law," the bankruptcy court's decision does not make such a sweeping determination. Instead, the court rightly relied upon Fifth Circuit precedent which permits bankruptcy courts to determine the appropriate rate of cramdown interest based on circumstances of the debtor and creditor in a particular case. (Record 17 at 13.) Here, the bankruptcy court's decision to apply the contract rate of interest was premised on several facts that were highlighted by RMR at the hearing on its motion for reconsideration. First, the court recognized "that LCI was in default of its contractual obligations to RMR when it filed for bankruptcy protection, that LCI is solvent, [and] that RMR is oversecured." (Record 17 at 14.) In addition, the court noted "[p]ayment of interest to RMR at the contractual default rate would not reduce the payment that any other secured or unsecured creditor is entitled to receive under the plan" and that payment of the default interest rate "would simply reduce the $85,000,000 in equity that may be available to Mr. Good at the conclusion of the plan in four years" (*Id.*) Based on these circumstances, the bankruptcy court determined the contractual rate of interest was appropriate with respect to RMR's claim against LCI.

LCI argues the bankruptcy court erred as a matter of law when it used the default contract rate in its calculation of postconfirmation interest. The thrust of LCI's argument is that the Supreme Court's decision in *Till v. SCS Credit Corporation* requires the application of the prime plus formula approach in calculating postconfirmation interest rate in Chapter 11 cases. According to LCI, *Till* and related Fifth Circuit authority "support the proposition that at least one proper method for determining the proper interest rate is the application of a formula based

8

on the prime rate plus an additional amount to compensate for additional risk" and the bankruptcy court's holding to the contrary "is a reversible error of law." (Appellant's Br. at 5.)

In *Till*, a plurality of the Supreme Court determined that bankruptcy courts should apply the formula approach to calculations of cramdown interest in Chapter 13 cases. *Till*, 541 U.S. at 479–80. There are two aspects of the *Till* decision which cast doubt on its application in the present case. First, in footnote 14, Justice Stevens acknowledges that the formula approach may not be the only appropriate method for calculating cramdown interest in Chapter 11 cases. According to Justice Stevens, Chapter 11 bankruptcies differ from Chapter 13 bankruptcies because in the Chapter 11 context, there may be a readily apparent market rate for cramdown lenders:

> Because every cramdown loan is imposed by a court over the objection of the secured creditor, there is no free market of willing cramdown lenders [in Chapter 13 bankruptcies]. Interestingly, the same is *not* true in the Chapter 11 context, as numerous lenders advertise financing for Chapter 11 debtors in possession . . . Thus, when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce. In the Chapter 13 context, by contrast, the absence of any such market obligates courts to look to first principles and ask only what rate will fairly compensate a creditor for its exposure.

*Id.* at 477 n.14. This footnote suggests that while the formula approach may be applied in the Chapter 11 context, its application is not required. *See American Homepatient*, 420 F.3d at 567.

Second, even if this court were to ignore the implications of footnote 14, *Till* is a plurality opinion and therefore does not necessarily reflect the rule for calculating cramdown interest in all circumstances. *See Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 348, 350 (5th Cir. 2008).[4]

---

[4] As the court explained in *Drive*, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Drive*, 531 F.3d at 348 (quoting *Marks v. United States*, 430 U.S. 188

In *Drive*, the Fifth Circuit only narrowly adopted the formula approach for Chapter 13 cases, noting: "[the] *Till* plurality's adoption of the prime-plus interest rate approach is binding precedent in cases presenting an essentially indistinguishable factual scenario." *Id.* at 350. Therefore, in the Fifth Circuit, bankruptcy courts still enjoy some latitude in determining which method should be applied to determine the cramdown interest rate in Chapter 11 cases.

Based on the foregoing, the bankruptcy court did not error when it applied the default contract rate to the calculation of postconfirmation interest.

**B. Term of Deferred Payments**

LCI also argues that the bankruptcy court erred in concluding that the proper term of deferred payments payable to RMR is three years rather than the four years offered under the plan. As RMR observes in its reply brief, however, the bankruptcy court's "Order Denying Motion to Convert Case to Chapter 7" states that the Modified Plan is no longer vacated with respect to RMR but instead was altered to provide for the 15% interest rate found in the reconsideration order:

> . . . . it is further
>
> ORDERED, ADJUDGED AND DECREED that, notwithstanding the Court's Memorandum Opinion and Order dated May 21, 2009, the Plan as it pertains to treatment of RMR's secured claim (Section 4.10) is confirmed as set out therein (pursuant to which the first payment to RMR under the Plan is due July 1, 2009), with the exception that the rate of interest to be paid on said secured claim shall be the contractual default rate under the pre-petition agreements between the parties, i.e., 15% per annum.

(Record 30.) Therefore, LCI's argument concerning the term of deferred payments is moot. Although RMR provides arguments to counter those offered by Appellants, it essentially

---

(1977)).

concedes this point in its reply brief. (*See* Appellee's Br. at 8 n.6.)

## IV. CONCLUSION

Based on the foregoing, the court hereby **AFFIRMS** the holdings of the bankruptcy court.

**IT IS SO ORDERED.**

**SIGNED this the 30th day of March, 2010.**

_____
RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE